# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Kristi Taylor,**

        **Plaintiff,**

**v.**                                             **Case No. 16-cv-2056-JWL**

**State of Kansas, Department of Corrections;**
**Corizon Health, Inc.; and Sam Cline, individually**
**and in his official capacity,**

        **Defendants.**

## MEMORANDUM & ORDER

In July 2014, plaintiff Kristi Taylor was working as a charge nurse in the Hutchinson Correctional Facility when she was sexually assaulted by an inmate. After an extended leave of absence, she returned to work and was terminated approximately two months later. She filed this lawsuit against defendants asserting that her employer, Corizon Health, Inc., terminated her employment on the basis of her disability (post-traumatic stress disorder stemming from the assault) and failed to accommodate her disability in violation of the Americans with Disabilities Act ("ADA"), *as amended by* ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, 42 U.S.C. § 12101 et seq. She further asserts that defendant Kansas Department of Corrections ("KDOC") discriminated against her on the basis of her disability in violation of the Rehabilitation Act, 29 U.S.C. § 794(a). Finally, she contends that the KDOC and defendant Sam Cline violated her Fourteenth Amendment substantive due process rights based on a theory of state-created danger. This matter is presently before the court on

defendants' motions for summary judgment (docs. 82, 84). As explained below, both motions are granted.

## I. Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party. Defendant Kansas Department of Corrections (KDOC) operates a number of correctional institutions in the State of Kansas, including Hutchinson Correctional Facility (HCF). At all relevant times, defendant Sam Cline was the warden at HCF. Defendant Corizon Health, Inc. has contracted with KDOC to provide health services to the inmates in KDOC's custody. Plaintiff Kristi Taylor is a registered nurse who was employed by Corizon as a charge nurse from January 1, 2014 through July 14, 2015.

Inmates at HCF are provided "sick call" slips that they may submit to the clinic when they have a need to be seen by a nurse. After reviewing the slips, a nurse will call over to the inmate's cell block and ask that the inmate be sent to the clinic. General population inmates (regardless of whether they are maximum, medium or minimum custody inmates) are then given a pass to travel to the on-grounds clinic by themselves. Inmates are only escorted to the clinic if they are in segregation. As a normal practice, KDOC stations two correctional officers on duty within the clinic at HCF—one at the officer's station on the "medical side" of the clinic and one at the officer's station on the mental health side of the clinic. An officer stationed in the clinic will maintain the officer's station overlooking the waiting room where the inmates sit and wait to be seen as well as make rounds through the clinic at least once an hour.

In November 2013, inmate Steven Stumpner was transferred to HCF, with Warden Cline's approval, from another facility after he violently attacked a female staff member at that facility. Warden Cline did not alert the staff at HCF that inmate Stumpner was being transferred because of an attack on a female staff member, but there is no evidence that he normally would notify staff members about such information or that any policy required him to do so. When he arrived at HCF, inmate Stumpner was placed into segregation as a result of the attack. Inmates placed into HCF's segregation unit remain there until the Segregation Board releases that inmate into the general population. The Segregation Board makes this determination based on an inmate's activity and demeanor, along with input from security personnel and Corizon's mental health staff. At some point, the Segregation Board released inmate Stumpner into the general population. Warden Cline has the authority to extend an inmate's stay in segregation, but he did not extend inmate Stumpner's stay. Although a Corizon employee had flagged inmate Stumpner as a "no Female Contact" inmate in the inmate's medical file, a computer "upgrade" deleted that designation and plaintiff was not aware of the designation. It is uncontroverted that Warden Cline had no knowledge that Corizon had designated inmate Stumpner as a "No Female Contact" inmate in his private medical file. Neither the KDOC nor HCF maintains that type of designation for inmates.

On July 17, 2014, inmate Stumpner was called to the medical clinic for a sick-call visit. Plaintiff, unaware of any "no female contact" designation, was alone with inmate Stumpner inside an examination room within the clinic. Inmate Stumpner sexually assaulted plaintiff. It was the first assault of a Corizon nurse at HCF in thirteen years. At the time of the assault, the officer stationed in the clinic was making rounds in the back of the clinic away from the room in

3

which plaintiff was conducting her examination. While the examination room was equipped with a panic or alarm button, plaintiff was unable to reach the alarm during the attack because inmate Stumpner was positioned between plaintiff and the alarm. He was criminally charged with rape and aggravated sexual battery by the Reno County District Attorney and he ultimately entered a plea to a reduced charge of attempted rape. As a result of the assault, plaintiff sought and received mental health treatment through Corizon's workers' compensation carrier from Dr. Molly Allen, a psychologist. Dr. Allen diagnosed plaintiff with and treated plaintiff for post-traumatic stress disorder (PTSD) and depression. Dr. Allen released plaintiff to return to work in mid-April 2015, but plaintiff did not return to work until May 14, 2015—a leave of absence of approximately 10 months. She returned to the same position she occupied prior to the assault.

On or about July 1, 2015, one of plaintiff's co-workers was attacked by an inmate in the clinic. Plaintiff was frustrated that the inmate was not immediately transferred out of HCF to another correctional facility and she voiced that frustration to her supervisors. Shortly thereafter, the inmate was transferred to the segregation unit but, on July 9, 2015, a determination was made to return the inmate to the clinic for medical treatment and monitoring. Plaintiff and the rest of the nursing staff were upset about the inmate returning to the clinic. On that same day, plaintiff told Debra Lundry, her supervisor, that her PTSD symptoms had flared in light of the inmate's return to the clinic and that she needed to go home. Ms. Lundry advised plaintiff that she could leave for the day. Later that day, according to Corizon, multiple people advised Ms. Lundry that plaintiff had suggested that the inmate was "faking" his condition and that the nursing staff would refuse to take care of him because no one wanted to enter his cell.

4

Defendant Corizon alleges that plaintiff told her subordinates on the nursing staff that if they did not want to treat the inmate, Corizon would "not do anything to them" if they said that they were sick and went home. Plaintiff denies telling this to the nursing staff but concedes that she told one of her co-workers, who was feeling ill and was contemplating leaving anyway, that she did not think Corizon would fire him if he was sick and went home.

Ms. Lundry relayed these reports to Warden Cline. Based on his conversation with Ms. Lundry, Warden Cline issued an admittance restriction against plaintiff. An admittance restriction, also known as a "gate stop," restricts an individual from entry to the HCF facilities. Thereafter, Corizon terminated plaintiff's employment based on the gate stop and plaintiff's alleged refusal to treat the inmate and encouraging others not to treat the inmate.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant

points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

### III. Disability Claims Against Corizon

In the pretrial order, plaintiff asserts claims for disability discrimination against defendant Corizon under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553. According to plaintiff, Corizon terminated her employment on the basis of her disability and failed to accommodate plaintiff's request for an accommodation. Corizon moves for summary judgment on these claims.

#### A. Termination Claim

The ADAAA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case of employment discrimination under the ADA, plaintiff must present evidence that (1) she is disabled within the meaning of the ADAAA; (2) she is qualified to perform the essential functions of her job with or without accommodations; and (3) she was terminated under circumstances which give rise to an inference that the termination was based on his disability. *Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 544 (10th Cir. 2014) (citations omitted). If plaintiff is able to make such a showing with respect to her discrimination claim, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for the termination decision. *Carter v. Pathfinder Energy Services, Inc*., 662 F.3d 1134, 1141 (10th Cir. 2011) (citing *McDonnell Douglas v. Green*, 411

U.S. 792, 802 (1973)).  Plaintiff then bears the ultimate burden of showing that defendant's proffered reason is in fact a pretext designed to mask discrimination. *See id*. (citing *McDonnell Douglas*, 411 U.S. at 804).

In its motion, Corizon contends that summary judgment is appropriate as to plaintiff's claim that Corizon terminated her employment on the basis of her post-traumatic stress disorder (PTSD) because plaintiff has come forward with no evidence that her PTSD substantially limits one or more of plaintiff's major life activities such that her prima facie case fails as to the first element.  As will be explained, summary judgment is granted in Corizon's favor on plaintiff's discrimination claim because there is no evidence that plaintiff's PTSD substantially limits plaintiff's major life activities.  Thus, because this case turns solely on whether plaintiff is disabled, the court declines to address the remaining arguments raised by Corizon in support of its motion.

Congress has provided three statutory definitions for "disability" under the ADA:  A plaintiff may show "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 544 (10th Cir. 2014) (quoting 42 U.S.C. § 12102(1)).  The ADA limits its protections, then, by recognizing that not all impairments are disabilities. *EEOC v. BNSF Railway Co*., ___ F.3d ___, 2017 WL 1325653, at *1 (10th Cir. Apr. 11, 2017).  In the pretrial order, plaintiff contends only that Corizon discriminated against her on the basis of an actual disability under subsection (A).  In her response to the motion for summary judgment, plaintiff alleges, in addition to the claim

she asserts in the pretrial order, that Corizon discriminated against her on the basis of a record of a disability.

To demonstrate an actual disability under subsection (A), plaintiff must have a recognized impairment, must identify one or more appropriate major life activities, and show that the impairment substantially limits one or more of those activities. *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014). Here, plaintiff contends that her PTSD substantially limits two of plaintiff's major life activities—sleeping and working.[1] To show that her PTSD substantially limits one or more major life activity, plaintiff must show that she is substantially limited in her ability to perform the major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). This analysis requires an "individual assessment," *id*. § 1630.2(j)(1)(iv), and may take into consideration facts such as the difficulty, effort or time required to perform the major life activity; pain experienced when performing a major life activity; and/or the way the impairment affects the operation of a major bodily function. *Id.* § 1630.2(j)(4)(ii). A medical diagnosis is insufficient; rather, the ADA requires

---

[1] In passing, plaintiff states on one occasion in her responsive brief that her PTSD substantially limits her ability to care for herself. Only one fact set forth by plaintiff arguably relates to her ability to care for herself. Treatment notes from Dr. Allen concerning a June 25, 2015 session with plaintiff indicate that plaintiff "had a rough week" and that plaintiff "had noticed that she was nearly completely lacking in motivation at home, and would sleep most of her off hours—letting chores pile up and socially withdrawing." At the most, this evidence suggests that plaintiff, over a one-week period of time, had difficulty caring for herself. It is clearly not sufficient to support the inference that plaintiff's PTSD substantially limited her ability to care for herself or, more to the point, that plaintiff cannot care for herself in the condition, manner or duration of the average person. *See* 29 C.F.R. § 1630.2(j) (substantial limitation assessed by severity of impairment, length of impairment and long-term impact of impairment); *Burns v. Snow*, 130 Fed. Appx. 973, 981-82 (10th Cir. May 16, 2005) (no significant limitation on ability to walk where evidence reflected difficulty walking on four occasions over an 11-month period).

plaintiffs to offer evidence that "the extent of the limitation caused by their impairment in terms of their own experience is substantial." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

The court begins with plaintiff's assertion that her PTSD substantially limits her ability to sleep. To survive summary judgment, plaintiff must show that a reasonable jury could find that her PTSD substantially limits her ability to sleep. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 545 (10th Cir. 2014). To do so, she must provide evidence that she is "significantly restricted as to the condition, manner or duration" of sleep as compared to the average person. *Id.* (citing *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216-17 (10th Cir. 2007)). In support of her assertion that her PTSD substantially limits her ability to sleep, plaintiff relies solely on four progress notes from Dr. Allen, her treating psychologist. Those notes cover a timespan of only 5 weeks—from June 4, 2015 to July 9, 2015. The notes indicate that plaintiff had been experiencing intermittent sleep problems since her return to work in mid-May 2015. The June 4, 2015 progress note, for example, indicates that plaintiff was having "difficulty sleeping" since her return to work and that plaintiff had been experiencing nightmares that disrupted her sleep since her return to the prison setting. The June 18, 2015 progress note states that plaintiff had difficulty "getting to sleep and maintaining sleep" and was experiencing "nightmares on and off." One week later, Dr. Allen noted that plaintiff had a "rough week" caused by having to care for a female corrections officer who had been assaulted by an inmate. Dr. Allen wrote that plaintiff, during that week, "would sleep most of her off hours." Finally, in her July 9, 2015 progress notes, Dr. Allen stated that plaintiff had a "recurrence" of nightmares after another nurse was attacked by an inmate.

For two reasons, plaintiff's evidence is insufficient to survive summary judgment. First, her evidence demonstrates that she suffered from sleep disruption and nightmares over roughly a two-month period in 2015—a relatively short period of time with no evidence of permanent or long-term disruption. *See Corley v. Principi*, 2007 WL 512513, at *735-36 (10th Cir. Feb. 20, 2007) (affirming summary judgment where evidence showed only intermittent periods of sleep disruption rather than permanent or long-term effects on the ability to sleep); *Pack v. Kmart Corp.* 166 F.3d 1300, 1306 (10th Cir. 1999) (affirming grant of judgment as a matter of law when plaintiff's evidence of episodes of sleep disruption over a six-month period failed to establish her problems were severe, long-term, or had a permanent impact); *McWilliams v. Jefferson County*, 463 F.3d 1113, 1116–17 (10th Cir. 2006) (affirming summary judgment when evidence showed only intermittent depressive episodes that caused difficulty sleeping); *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 497-98 (10th Cir. 2000) (intermittent insomnia over two-year period due to depression insufficient to show substantial limitation in sleeping, and intermittent period of excessive sleeping precluded inference that insomnia was severe or permanent).

Second, she offers no evidence, as she must, demonstrating how her difficulties sleeping compare to those of the average person in the general population. Indeed, her evidence of sleep disruption is even less than the evidence set forth by the plaintiff (and rejected by the Circuit) in *Humbles v. Principi*, 141 Fed. Appx. 709, 712 (10th Cir. July 7, 2005). In that case, the plaintiff presented evidence that his PTSD resulted in his getting only four to five hours of sleep per night. The Tenth Circuit nonetheless affirmed the grant of summary judgment in the absence of any evidence that the plaintiff's sleep disturbances "presented a substantial limitation compared

to the general public." *Id*. As the Circuit has recognized, many people in the general population "of course, have . . . trouble sleeping." *Johnson v. Weld County*, 594 F.3d 1202, 1218 n.10 (10th Cir. 2010). Plaintiff, then, has simply not shown that her sleeping troubles qualify her as disabled for purposes of the ADA. *Cf. Smothers*, 740 F.3d at 546 (factual issues existed about whether plaintiff's sleep was substantially limited where evidence showed that plaintiff, for more than 2 years, consistently complained of an inability to sleep more than four to six hours each night and consistently complained of waking multiple times each night due to pain).

Plaintiff's assertion that her PTSD substantially limits her ability to work fares no better. Plaintiff contends that Corizon's own reaction to the attack demonstrates that, at the time of her termination, she was substantially limited in her ability to work. Plaintiff highlights evidence that high-level management at Corizon all agreed at the time of the attack that plaintiff would need mental health support and forecasted that plaintiff could need treatment beyond the three counseling visits provided under Corizon's employee assistance program. She highlights a statement from Gerald Jorgenson, Corizon's senior director of operations for the Kansas region, in which he noted that plaintiff's mental health could be "a long standing issue" after the assault and that some management level employees doubted whether plaintiff would be able to return to work at Corizon following the assault. But the fact that plaintiff's employer recognized the seriousness of the assault and the support that plaintiff would undoubtedly require in the aftermath of that assault does not render plaintiff's PTSD "substantially limiting" for purposes of the ADA. A "disability" for purposes of the ADA requires more than a medical diagnosis of a particular condition; it requires substantial limitation on a major life activity. *See Williams v. Hallmark Cards, Inc.*, 10 Fed. Appx. 790, 793 (10th Cir. June 5, 2001). The reaction of

11

plaintiff's employer to the assault does not demonstrate in any way that plaintiff's PTSD substantially limited her ability to work.

The only other evidence that plaintiff sets forth relating to her ability to work are Dr. Allen's progress notes from June and July 2015. Those notes support the inference that plaintiff was substantially limited in her ability to work in a prison setting. The notes demonstrate that her PTSD symptoms could be triggered in a prison setting and that plaintiff continued to suffer from anxiety "in the prison population." But to be disabled in the major life activity of working, an employee must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Allen v. SouthCrest Hosp.*, 455 Fed. Appx. 827, 834 (10th Cir. 2011) (citations omitted). Working as a nurse in a prison setting does not qualify as a class or broad range of jobs—and plaintiff does not contend otherwise. Plaintiff also suggests that her 10-month leave of absence from work is sufficient to show a substantial limitation on her ability to work. The problem with plaintiff's argument, however, is that there is no evidence from which a jury could reasonably conclude that she was totally unable to work for the duration of her leave. The record certainly supports the conclusion that plaintiff could not work in a prison setting during her leave of absence. But there is no evidence that she was unable or restricted from working in any other environment during her leave of absence from Corizon. Even Dr. Allen testified that she had never concluded at any time—including during plaintiff's leave of absence—that plaintiff was unable to work. For the foregoing reasons, then, plaintiff cannot show that she suffered from an actual disability at the time of her termination.

In her response to the motion for summary judgment, plaintiff also asserts that Corizon discriminated against her based on a "record" of disability—again, plaintiff's 10-month leave of absence from work during which, according to plaintiff, she was totally unable to work in light of her PTSD. The pretrial order is devoid of any reference to a "record" of a disability under subsection (B) and, accordingly, the court agrees with Corizon that this theory has been waived. *See Genesis Health Clubs, Inc. v. LED Solar & Light Co*., 639 Fed. Appx. 550, 555 (10th Cir. 2016); *Roberts v. Cessna Aircraft Co*., 289 Fed. Appx. 321, 328 n.5 (10th Cir. Aug. 14, 2008). But even if plaintiff had preserved the theory, she has not raised a fact issue on whether she had a record of a disability. "To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Doebele v. Sprint/United Management Co*., 342 F.3d 1117, 1132 (10th Cir. 2003) (quoting *Sorensen v. Univ. of Utah Hosp*., 194 F.3d 1084, 1087 (10th Cir. 1999)). "The record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities." *Id*. Plaintiff, as with her actual disability claim, asserts that she satisfies this definition on the basis of her 10-month leave of absence from work, contending that her leave constitutes a record showing that her PTSD substantially limited her ability to work. The court rejects this argument for the same reason it rejected the same argument in connection with plaintiff's actual disability claim. As such, plaintiff has not set forth evidence demonstrating a factual issue on whether she had a record of a disability. Summary judgment is appropriate on her disability discrimination claim.

*B. Failure to Accommodate Claim*

The ADAAA prohibits an employer from "unlawfully discriminating against an employee by failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017) (citations and quotations omitted). The statute, then, creates a cause of action for disabled employees whose employers fail to reasonably accommodate them. *Id.* Summary judgment is appropriate on this claim because plaintiff has not established that she is disabled for purposes of the ADA. *See Felkins v. City of Lakewood*, 774 F.3d 647, 649 (10th Cir. 2014) (declining to address failure to accommodate issue where plaintiff failed to present sufficient evidence of disability); *Sanchez v. Vilsack*, 695 F.3d 1174, 1177-78 & n.2 (10th Cir. 2012) (to prevail on a failure-to-accommodate claim, plaintiff must demonstrate that he or she is disabled).

## IV.    Rehabilitation Act Claim against the KDOC

Plaintiff asserts in the pretrial order that defendant KDOC issued the "gate stop" against plaintiff on the basis of her disability in violation of the Rehabilitation Act, which prohibits recipients of federal funding from discriminating on the basis of disability. 29 U.S.C. § 794(a).[2] The elements required to establish a violation of the Rehabilitation Act are the same as those required to establish a violation of the ADA. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1262

---

[2] In her response to the KDOC's motion for summary judgment, plaintiff sets forth an additional claim of disability discrimination against the KDOC—that the KDOC, after receiving notice of plaintiff's PTSD diagnosis, refused to offer plaintiff the opportunity to explain to Warden Cline why the temporary gate stop should not become permanent. Because this claim is not contained in the pretrial order, it has been waived. *See Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 639 Fed. Appx. 550, 555 (10th Cir. 2016).

(10th Cir. 2010).  Thus, because plaintiff has not set forth evidence demonstrating a factual issue on whether she had an actual disability or a record of a disability for purposes of the ADA, she cannot establish a disability for purposes of the Rehabilitation Act.  Summary judgment, then, is granted in favor of the KDOC on this claim.[3]

## V.     Section 1983 Claim against the KDOC and Sam Cline

Finally, plaintiff asserts a Fourteenth Amendment substantive due process claim against defendants KDOC and Warden Sam Cline based on a theory of state-created danger.  The KDOC moves for summary judgment on the grounds that plaintiff's claim is barred by the Eleventh Amendment.  Plaintiff concedes as much in her response and clarifies that her § 1983 claim is asserted against Warden Cline in his individual capacity.  The KDOC's motion on this issue, then, is granted.  Warden Cline asserts that he is entitled to summary judgment on this claim based on qualified immunity.  Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010).  When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right

---

[3] Plaintiff broadly asserts in the pretrial order that the KDOC failed to accommodate her disability but there is no evidence in the record of any request by plaintiff to the KDOC for an accommodation and there are no facts from which the court might discern the need for an accommodation from the KDOC.  Viewed in the light most favorable to plaintiff, the sole accommodation she desired was the ability to leave work early on July 9, 2015 in light of her PTSD symptoms.  It is uncontroverted that the KDOC had no knowledge of that request.  Thus, even if plaintiff had demonstrated the existence of a factual dispute on whether she is disabled, summary judgment would nonetheless be warranted on her failure-to-accommodate claim.  *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1315-16 (10th Cir. 2017) (employer's duty to accommodate is not triggered until employee makes request).

15

and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). As will be explained, plaintiff has not established that Warden Cline violated her constitutional rights. The court, then, declines to address whether the right alleged by plaintiff was clearly established.

The Tenth Circuit has recognized only two exceptions to the general rule that the Due Process Clause imposes no duty to protect against private violence—when the state has assumed a special relationship with and control over an individual (as when the individual is in state custody) and when a state official "created the very danger that caused the harm." *See Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014). Plaintiff does not argue that the first exception applies; rather, she relies solely on the danger-creation exception. "The state-created danger theory is a means by which a state actor might be held liable for an act of private violence absent a custodial relationship between the victim and the State, under narrowly prescribed circumstances bearing upon conduct, causation, and state of mind, *provided* the danger the state actor created, or rendered the victim more vulnerable to, precipitated a deprivation of life, liberty, or property in the constitutional sense." *Gray v. Univ. of Colorado Hosp. Authority*, 672 F.3d 909, 922 (10th Cir. 2012) (emphasis in original). It is a "narrow exception, which applies only when a state actor affirmatively acts to create . . . danger from private violence." *Id*. at 921.

To establish a claim under that theory, plaintiff must show that (1) the charged individual actor created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put

plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendant acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking. *See Gillen*, 761 F.3d at 1105. In addition, there are two "preconditions" that plaintiff must establish—that the state actor engaged in affirmative conduct and that there was private violence. *Id.* In his motion for summary judgment, Warden Cline asserts that plaintiff cannot establish a substantive due process violation because she has not shown the first precondition, an affirmative act on the part of Warden Cline. Warden Cline further contends that plaintiff has not shown that Warden Cline's conduct was conscience shocking. As explained below, the court agrees that plaintiff cannot establish a substantive due process violation for both of these reasons.

In the pretrial order, plaintiff alleges that Warden Cline engaged in affirmative conduct by disregarding Inmate Stumpner's "No Female Contact" designation; by failing to equip plaintiff with an alarm or panic button or to have one within her reach; by failing to station an officer within hearing range of plaintiff while she was treating inmate Stumpner; and by leaving plaintiff alone with inmate Stumpner. In her response to Warden Cline's summary judgment motion, however, she concedes that Warden Cline had no knowledge of any "No Female Contact" designation and that she cannot proceed on this theory. Moreover, she does not mention in her response Warden Cline's failure to provide an alarm or panic button within her reach or Warden Cline's failure to station an officer within hearing range of plaintiff—despite the fact that Warden Cline expressly moved for summary judgment on those theories. Plaintiff's failure to address those theories, then, is fatal to her claim. *Hinsdale v. City of Liberal, Kansas*, 19 Fed. Appx. 749, 769 (10th Cir. 2001) (failure to address claims or theories in summary

judgment response is fatal to claims when moving party has made an argument as to why summary judgment is appropriate). Summary judgment is appropriate in any event on plaintiff's theories that Warden Cline failed to provide an alarm and failed to station an officer within hearing range of plaintiff because a failure to act is not an affirmative act. *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (inaction is not enough to invoke state-created danger theory); *Briggs v. Johnson*, 274 Fed. Appx. 730, 734 (10th Cir. 2008) (To state a claim under the danger creation theory, the defendant's actions must involve affirmative conduct; the failure to act, even in the face of a known risk, is insufficient.).

Plaintiff's sole remaining theory is that Warden Cline "left plaintiff alone" with inmate Stumpner—a theory that she fleshes out somewhat in her response. According to plaintiff, Warden Cline is liable to her because he "accepted the transfer" of inmate Stumpner from another facility; he ignored information about or failed to investigate inmate Stumpner's propensity to commit sexual and violent attacks on female staff members; and he failed to warn the staff at HCF that inmate Stumpner had been transferred due to an attack on a female staff member. To begin, none of these specific theories are preserved in the pretrial order and have been waived. *See Cortez v. Wal–Mart Stores, Inc*., 460 F.3d 1268, 1276–77 (10th Cir. 2006) (claims, issues, defenses or theories of damages not included in the pretrial order are waived). But summary judgment is appropriate on these theories in any event. Warden Cline's acceptance of the transfer of inmate Stumpner nearly 8 months prior to the attack on plaintiff is too remote to establish a causal link between the danger to plaintiff and the resulting harm. Affirmative conduct for purposes of the state-created danger theory imposes an immediate threat of harm (which by its nature has a limited range and duration) directed at a discrete plaintiff.

*Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). In *Ruiz*, the Circuit rejected a "danger creation" § 1983 claim where the plaintiff alleged that the state actors had improperly licensed a daycare facility (where a child was shaken to death) after failing to conduct an investigation into the facility. *See id*. The Circuit held that the improper licensure did not impose an immediate threat of harm but only a threat of an indefinite range and duration. *Id*. Similarly, Warden Cline's November 2013 acceptance of inmate Stumpner's transfer imposed, at most, a threat of indefinite range and duration. Moreover, Warden Cline's acceptance of the transfer did not specifically put plaintiff (who was not even working at the facility at the time of the transfer) at risk as opposed to all other female staff at HCF. *See id*. (unlike the direct placement of a child into an abusive home, the licensure of a daycare facility was not aimed at decedent directly but affected public at large, even if, in reality, the licensure only enhanced the danger of abuse to the children enrolled in the facility); *Gray v. Univ. of Colorado Hosp. Authority*, 672 F.3d 909, 927 (10th Cir. 2012) (defendants' challenged policies were not aimed at decedent directly; no affirmative conduct sufficient to impose liability even though policies did not increase danger to the public at large in any real sense but rather to a defined group— namely patients in the Epilepsy Monitoring Unit). Warden Cline's acceptance of the transfer request, then, is not sufficient to impose liability under a danger-creation theory.

Plaintiff's allegations that Warden Cline failed to investigate inmate Stumpner's alleged propensity to commit sexual attacks on female staff members and failed to warn the staff about the previous attack cannot support her § 1983 claim because, as noted earlier, a failure to act, even in the face of a known risk, is not sufficient to support § 1983 liability under a danger-creation theory. *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (inaction is

not enough to invoke state-created danger theory).  In an effort to avoid this result, plaintiff contends that the Tenth Circuit, in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), recognized that a state actor's failure-to-investigate can be considered an "affirmative" act for purposes of the danger-creation theory.  Plaintiff misconstrues the *Currier* decision.  In that case, the state granted physical, and eventually legal, custody of two young children to the children's father.  242 F.3d at 909–10.  Prior to the state granting physical custody to the father, a state social worker assigned to the case became aware of the father's history of financial irresponsibility with respect to the children, including making only eight child support payments in the previous three years. *Id*. at 909.  Despite this knowledge, the social worker said nothing to the Children's Court during the hearing at which physical custody was awarded to the father.  *Id*.  Later, but prior to the father gaining legal custody of the children, the same social worker noticed bruises on the children on at least two occasions while the children were in the physical custody of the father, and was informed on at least three other occasions that the children's father and/or the father's girlfriend were allegedly abusing the children.  *Id*. at 909–10, 919.  Despite these indications of abuse, the social worker failed to launch any investigation and ultimately, through either his affirmative recommendation or his silence with respect to the indications of abuse, was responsible for the father obtaining legal custody of the children.  *Id*.  The father later killed one of the children by scalding him with boiling water.  *Id*. at 910.

While the Circuit in *Currier* observed "that the defendant had failed to investigate or act on the allegations of abuse," the Circuit also noted "that this failure to act should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father."  *Gonzales v. City of Castle Rock*, 307 F.3d 1258,

1263 (10th Cir. 2002) (citing *Currier*, 242 F.3d at 920 n.7); *see Dahn v. Adoption Alliance*, 2014 WL 12496539, at *12 (D. Colo. Aug. 28, 2014) ("It would be a misreading of *Currier* to suggest a danger creation claim can rest solely on a failure to investigate or a failure to 'rescue' an alleged victim of abuse.").  Unlike the facts presented in *Currier*, there is simply no evidence here that Warden Cline failed to investigate inmate Stumpner's alleged propensity in the face of specific knowledge of real danger to plaintiff let alone that Warden Cline failed to investigate inmate Stumpner in the context of any affirmative conduct with respect to inmate Stumpner or plaintiff.  The court, then, rejects plaintiff's suggestion that Warden Cline's failure to investigate is sufficient to establish the requisite affirmative conduct.

For the foregoing reasons, the record does not reflect that Warden Cline engaged in any affirmative conduct that put plaintiff at substantial risk of serious, immediate, and proximate harm.  The lack of affirmative conduct is fatal to plaintiff's substantive due process claim.  But even if plaintiff could show that Warden Cline engaged in affirmative conduct, summary judgment would nonetheless be appropriate because there is no evidence from which a reasonable jury could conclude that Warden Cline's conduct was conscience shocking.  The "ultimate standard for determining whether there has been a substantive due process violation is 'whether the challenged government action shocks the conscience of federal judges.'"  *See Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (quotations omitted).  It is well settled that "negligence is not sufficient to shock the conscience" and that plaintiff "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  *Id*. (citations omitted).  Even knowingly permitting

unreasonable risks to continue does not necessarily rise to the level of conscience shocking.  *Id.*

Rather, the plaintiff must demonstrate a "high level of outrageousness."  *Id.* at 1041.

In *Uhlrig v. Harder*, for example, the defendants closed a special unit in a mental hospital

that was reserved for the criminally insane and higher risk patients, which led to the placement

of a particular patient into the general hospital population where Ms. Uhlrig worked as a

therapist.  64 F.3d 567, 569-70 (10th Cir. 1995).  After the transfer, the patient assaulted and

raped a female patient in one unit and was then transferred to another unit where he attacked and

killed Ms. Uhlrig.  *Id.* at 571.  The Circuit held that the defendants' decision to close the special

unit in the mental hospital and transfer the particular patient to the general hospital population

did not shock the conscience.  In doing so, the Circuit emphasized:

> [W]e must bear in mind three basic principles highlighted by the Supreme Court in
> evaluating substantive due process claims: (1) the need for restraint in defining
> their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need
> for deference to local policymaking bodies in making decisions impacting upon
> public safety.

64 F.3d at 573.  The Circuit held that the defendants' conduct did not shock the conscience

because none of the defendants "intended to injure" Ms. Uhlrig when it decided to close the

special unit, "nor were they indifferent to the risk that would be created by such action."  *Id.* at

576.  The Circuit found "no difficulty" concluding that defendants did not engage in egregious

or outrageous conduct because the defendants did not affirmatively mislead Ms. Uhlrig about

the risks created by the decision to close the unit and because the defendants' actions "resemble

those typical of legitimate governmental decisions in times of scarcity—that is, the making of

difficult policy choices to reconcile various competing social, political, and economic forces."

*Id.*

On two separate occasions, the Circuit has analyzed the conscience-shocking standard in the context of a prison librarian who was raped by an inmate. On both occasions, the Circuit found that the defendants' negligence in removing a corrections officer from the library for the librarian's protection was not so egregious as to shock the conscience. In *Liebson v. New Mexico Corrections Dep't*, 73 F.3d 274 (10th Cir. 1996), the Circuit rejected a substantive due process claim based on allegations that correction officials failed to provide adequate security to the librarian. In that case, the plaintiff alleged that prison officials violated her substantive due process rights when they changed the schedule of an officer assigned to the library such that she was on duty as a librarian with no officer present when she was kidnapped, held hostage and sexually assaulted by an inmate library assistant. *Id*. at 275. The Circuit held that the plaintiff failed to allege any conduct that shocked the conscience. *Id*. at 276. Similarly, in *Maine v. Oklahoma Department of Corrections*, 1997 WL 602688 (10th Cir. Sept. 30, 1997), the Circuit rejected a substantive due process claim where the plaintiff—a prison librarian—failed to present evidence that the defendants' conduct was conscience-shocking. In that case, the evidence reflected that the prison lacked sufficient security officers to make the required hourly security checks of the library and lacked the funds necessary to provide employees with two-way radios or body alarms. *Id*. at *5. Because there was no evidence that prison officials had intentionally isolated the plaintiff or took affirmative steps to place her in danger, the Circuit held that their conduct did not reflect a wanton or complete indifference to risk despite the fact that the plaintiff was raped by an inmate in the library. *Id*.

In support of her argument that Warden Cline's conduct shocks the conscience, plaintiff relies on the Tenth Circuit's opinions in *Currier* and *Armijo ex rel. Chavez v. Wagon Mound*

*Public Schools*, 159 F.3d 1253 (10th Cir. 1998). As explained above, the facts of *Currier* are distinguishable from the facts of this case. The social worker in *Currier* noticed bruises on the children on two occasions and was informed on three other occasions that the children's father was abusing the children. 242 F.3d 905, 909-10 (10th Cir. 2001). Despite strong indications of abuse, the social worker facilitated the father obtaining legal custody of the children. *Id*. at 910. The Circuit found that, although it was a "close question," the facts alleged were sufficiently conscience-shocking to warrant a trial on the substantive due process claim in light of the totality of the allegations concerning the social worker's conduct. *Id*. at 920. In *Armijo*, the Circuit found triable questions of fact on the plaintiff's § 1983 danger-creation claim where a special needs student committed suicide after the principal and counselor suspended him from school and then left him home alone, where he had access to firearms. 159 F.3d at 1264. The evidence in that case demonstrated that the principal and counselor potentially increased the risk of harm to the student because they suspended him; they knew he was angry and distraught; they knew he had made suicidal comments; they knew he had access to firearms at home; they drove him and then left him at home alone in violation of a disciplinary policy that prohibited out-of-school suspensions when a student's parent was not home; and they failed to notify his parents. *See id*. Like the social worker in *Currier*, then, the principal and counselor in *Armijo* took several affirmative, deliberate steps with respect to the plaintiff that significantly increased the risk of harm to that plaintiff, particularly in light of their knowledge of the plaintiff's vulnerability. The facts in the record before the court are much more akin to those analyzed by the Circuit in *Uhlrig*, *Liebson* and *Maine*. Viewing the evidence in the light most favorable to plaintiff, Warden Cline did not intend to injure plaintiff and did not take any affirmative steps to

place plaintiff in danger. Warden Cline's conduct, as described by plaintiff, amounts to negligence which, as a matter of law, does not rise to the level of a due process violation. *See Uhlrig*, 64 F.3d at 573-74. In sum, plaintiff has not come forward with facts from which a reasonable jury could find that Warden Cline's conduct was so egregious, outrageous or fraught with unreasonable risk so as to shock the conscience. *See id.* at 576. Warden Cline, then, is entitled to qualified immunity with respect to plaintiff's substantive due process claim. Summary judgment in his favor is granted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Corizon Health, Inc.'s motion for summary judgment (doc. 82) is **granted** and defendants Sam Cline and the Kansas Department of Correction's motion for summary judgment (doc. 84) is **granted**.

**IT IS SO ORDERED.**

Dated this 25th day of April, 2017, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge